**Larry David DAVIS, Petitioner–Appellant,**

v.

**Jeanne S. WOODFORD, Warden, of California State Prison at San Quentin, Respondent–Appellee.**

No. 01–99014.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 5, 2002.

Filed June 24, 2003.

Amended Sept. 21, 2004.

Tracy J. Dressner, La Crescenta, CA, and Terry J. Amdur, Pasadena, CA, for the petitioner-appellant.

Bill Lockyer, Attorney General of the State of California, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Senior Assistant Attorney General, Carol F. Jorstad, Deputy Attor-

**634**

ney General, Louis W. Karlin, Deputy Attorney General, and Shawn McGahey Webb, Deputy Attorney General, Los Angeles, CA, for the respondent-appellee.

Before B. FLETCHER, KLEINFELD, and McKEOWN, Circuit Judges.

## ORDER AND AMENDED OPINION

### ORDER

A majority of the panel has voted to deny the petition for rehearing and to deny the petition for rehearing en banc. Judge Fletcher votes to grant the petition for rehearing and so recommends with respect to the petition for rehearing en banc, in accord with the attached dissent. The opinion filed on June 24, 2003, shall be amended to incorporate Judge Fletcher's dissent.

The full court has been advised of the petition for rehearing and rehearing en banc and no judge has requested a vote on whether to rehear the matter en banc. Fed. R.App. P. 35.

The petition for panel rehearing and the petition for rehearing en banc are denied. The mandate shall not issue until it is determined whether, as a result of the amended opinion, any judge of the court desires to call for an en banc rehearing pursuant to General Order 5.4. No further petitions shall be accepted from the parties.

### OPINION

McKEOWN, Circuit Judge.

Larry David Davis was convicted of first-degree murder and sentenced to death. After exhausting his California state appeals, he filed an amended petition for habeas corpus in federal district court, raising multiple constitutional challenges to both the conviction and sentence. The district court denied the petition. Having reviewed the record, transcript, arguments, and prior decisions, including the extensive opinions of the California Supreme Court and the district court, we affirm.

#### BACKGROUND

Davis's conviction and sentence stem from two events that occurred close in time and proximity in the early hours of August 28, 1988: the attempted rape of Suzanne H. and the death by asphyxiation and apparent kidnapping and sodomy of Dawn Holman. According to Suzanne H.'s trial testimony, she met Davis in a bar on August 26, 1988, and invited him to meet her the next evening for her birthday. She and Davis went out the next night, along with one of her friends. At the end of the evening, Suzanne H. drove her friend home, and then agreed to take Davis to a party ostensibly being given by a friend of his. As they were driving, Davis directed her to a dead-end road, took the keys out of the ignition, and began groping her. She first tried to end his advances by telling him she was a lesbian, but that seemed only to excite him more. She was finally able to persuade him to stop by telling him that she would have sex with him in a motel in town. Davis gave her car keys back to allow her to drive to a motel, and she drove toward town, trying unsuccessfully to attract the attention of police.

Once in town, Suzanne H. told Davis that she needed to get gas before going to the motel. While Davis was pumping gas, she went to the cashier, told him that Davis had tried to rape her, and asked him

to call the police. Davis came after her and tried to drag her away, but she elbowed him and screamed "Rape!" and he let her go. When the police arrived, Davis ran away, though not before removing the coil wire from Suzanne H.'s car. Suzanne H. gave a statement to the police, but said she did not wish to participate in a prosecution, saying that she was returning to New York within days. Later that night, one of the police officers who had interviewed Suzanne H. stopped Davis for urinating in public and loitering, but the officer did not connect Davis with the Suzanne H. incident. When asked what he was doing, Davis claimed to be friends with the occupants of a nearby house. The officer awakened the residents of the house, who denied knowing Davis, and the officer told Davis to leave.

After his run-in with the officer, Davis made his way to a nearby Safeway grocery store, and it was there that he met Dawn Holman. At about 3 a.m., he was standing on the sidewalk in front of the store smoking marijuana when a man, later identified as Emanuel Manson, came over and asked for a hit. Davis agreed, and asked him for a ride to Ventura. Manson declined, and later saw Davis asking for a ride from a woman who had just pulled into the parking lot. That woman was Dawn Holman. She agreed to give Davis a ride, and they left alone in Holman's car.

Holman's body was found around 5 a.m. by a greenskeeper at a nearby golf course. Her car was partially in a ditch about 265 feet from her body; the front passenger door was heavily damaged, and appeared to have hit a nearby telephone pole. According to the medical examiner, Holman died from asphyxiation from strangulation, likely manual strangulation, but not before suffering extensive external and internal injuries as a result of having been seated in—or partially out of—the passenger seat when the car struck the telephone pole.

The medical examiner testified that Holman's body showed evidence of sexual assault: her body was found with her bra pulled down below her chest, she was strangled, and her anus was dilated and smeared with fecal matter. The medical examiner also found a large number of sperm in her anal canal and a smaller number in her vaginal canal, and noted that her skirt was heavily stained with semen and fecal material, suggesting that she had been sodomized. He speculated that the sodomy occurred after she suffered the car crash injuries, perhaps shortly after her death. Moreover, in his view, if the sex had occurred before her death, she would have been in too much pain from her other injuries to engage in consensual intercourse. He also testified that although the crash injuries were highly disabling and could have resulted in her death, the strangulation was in fact the cause of her death.

Serological testing of the stains on Holman's skirt revealed that Davis was within the 1% of the population that could have been the source of the semen. Davis's DNA matched the DNA found on some of the skirt stains. In addition, a breast swab taken from Holman indicated a high probability of saliva with the same basic blood type as Davis's, and two hairs found on Holman's body were consistent with Davis's hair. Finally, a small piece of glass found in the shirt Davis was wearing on the night of the incident was consistent with broken glass from Holman's car.

Several days after Holman's death, two Ventura County police officers questioned Davis. The questioning focused on the Suzanne H. incident, but at the end of the conversation the officers mentioned that they were looking into a homicide. Davis told the officers that after leaving Suzanne

H., he was stopped for urinating in public, and was picked up by somebody and taken back to his truck, where he sat and drank. The officers arrested Davis for the assault on Suzanne H. and booked him into the Ventura County jail. Soon after, he was arrested and re-booked for Holman's murder. Criminal charges relating to both events were filed against Davis in December 1988.

Davis ultimately went to trial on six counts: (1) first-degree murder of Holman (Cal.Penal Code § 187(a)) with felony-based special circumstances for kidnapping (Cal.Penal Code §§ 207, 209, 190.2(a)(17)) and sodomy (Cal.Penal Code §§ 286, 190.2(a)(17)); (2) sodomy of Holman (Cal.Penal Code § 286(c)); (3) kidnapping of Holman (Cal.Penal Code § 207(a)); (4) sexual battery of Suzanne H. (Cal.Penal Code § 243.4); (5) assault of Holman with intent to commit sodomy (Cal.Penal Code §§ 261(a)(2), 286); and (6) assault of Suzanne H. with intent to commit rape or sodomy (Cal.Penal Code §§ 261(a)(2), 286).

At trial, Davis offered what can only be characterized as a convoluted story, in which he played only a supporting rather than a starring role in the events that led to Holman's death. He admitted that during his interview with the Ventura County police officers, he lied about his activities the night of the murder, and claimed that he had done so because his life and the lives of his family were "threatened." He offered a narrative of the evening involving three extra people, including a mysterious "white guy," an extra car, and Davis as the unlikely hero.

According to Davis, he and Holman left the Safeway in her car, while Manson followed in his. The three parked and smoked some more pot, and then Holman and Davis left together, smoked some more dope, and had consensual sex. They were discovered in the car by Holman's one-time boyfriend, Ashley Reid, who arrived with Manson and the anonymous white man. Angered by Holman's conduct with Davis, Reid got into Holman's car with her and the others got into Manson's car. The three men followed Reid and Holman to the golf course, witnessed them fighting in the car on the way, and then saw the car hit a telephone pole while Holman was partially hanging out of the passenger side of the car.

Davis testified that he jumped out of his car, ran to Holman, picked her up, and ran across the golf course with her, but that the "white guy" caught up and told him Reid wanted to speak with him. Davis left Holman where she lay and returned to the car to find Reid pointing a gun at him. Davis kicked the gun out of Reid's hand, ran away, apparently was hit by some sort of vehicle, and was slapped awake the next morning by a shabbily-dressed old man on the railroad tracks. Because he did not realize anybody had been killed, and because he received some veiled threats from an associate of Reid's, he did not report the incident to the police.

Both Reid and a man who was identified as potentially being the "white guy" provided alibis for the night in question. At trial, Manson refused to answer most of defense counsel's questions. The jury found Davis guilty on all counts as charged, with the exception of count 2, sodomy of Holman, on which the jury found Davis guilty of the lesser included offense of attempted sodomy. The jury began the penalty phase six weeks later. After hearing from a number of witnesses for both sides, the jury returned a death verdict. The California Supreme Court affirmed Davis's conviction and sentence on automatic appeal. *People v. Davis*, 10 Cal.4th 463, 488, 41 Cal.Rptr.2d 826, 896 P.2d 119, 129 (1995), *cert. denied sub nom. Davis v. California*, 516 U.S. 1121, 116

S.Ct. 932, 133 L.Ed.2d 859 (1996). The California courts also rejected Davis's state petition for writ of habeas corpus filed in March 1995.

Davis initiated his federal action by filing a Request for Appointment of Counsel and for Stay of Execution with the district court on April 5, 1996. He filed a mixed petition for writ of habeas corpus on April 22, 1997. The district court stayed Davis's habeas case pending exhaustion of the unexhausted claims in state court. Davis then filed a second state habeas petition containing the unexhausted claims, which the California Supreme Court denied after rejecting all claims on the merits. Davis subsequently filed his Amended Petition for Writ of Habeas Corpus, listing seventeen claims, in federal court. The district court granted the state of California's motion for summary judgment, denied Davis's cross-motion for partial summary judgment, and denied with prejudice Davis's petition for writ of habeas corpus. Although the district court denied Davis's request for an evidentiary hearing, it is apparent from its 173–page decision that the district court gave careful and thoughtful consideration to the case, exhaustively treating each claim. We granted a certificate of appealability on ten of Davis's seventeen claims.

### STANDARD OF REVIEW

Davis seeks two forms of relief: an evidentiary hearing on the majority of his claims and reversal of the district court's grant of summary judgment to the state of California on the remaining claims.[1] Because Davis filed only his Request for Appointment of Counsel and for Stay of Execution, not his Amended Petition for Writ of Habeas Corpus, before the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), AEDPA's standards of review are applicable to both the merits and procedural aspects of this appeal. *See Woodford v. Garceau,* 538 U.S. 202, 123 S.Ct. 1398, 1404, 155 L.Ed.2d 363 (2003) ("[W]e hold that ... a case does not become 'pending' until an actual application for habeas corpus relief is filed in federal court."); *see also Valerio v. Crawford,* 306 F.3d 742, 763 (9th Cir.2002) (applying appellate review provisions of AEDPA, 28 U.S.C. § 2253(c)) (citing *Slack v. McDaniel,* 529 U.S. 473, 480–82, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000)).

■ Under AEDPA, we may grant habeas relief only if the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court ...; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor,* 529 U.S. 362, 407–09, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), while the second prong applies to decisions based on factual determinations, *Miller–El v. Cockrell,* 537 U.S. 322, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003).

■ To satisfy the "unreasonable application" portion of the first prong, the petitioner must demonstrate that the state

---

1. Davis requests an evidentiary hearing on: (1) ineffective assistance of counsel in the guilt phase; (2) ineffective assistance of counsel at the penalty phase; (3) ineffective assistance of counsel with respect to his expert's testimony; (4) his competence in the penalty phase; (5) juror bias; and (6) cumulative effect of errors. He seeks reversal of summary judgment on the following bases: (1) denial of severance of the Suzanne H. and Holman charges; (2) sufficiency of the evidence; (3) prosecutorial vouching; and (4) violation of Confrontation Clause rights.

court's application of Supreme Court precedent to the facts of his case was not only incorrect but "objectively unreasonable." *Woodford v. Visciotti,* 537 U.S. 19, 123 S.Ct. 357, 360 (2002). "While Supreme Court precedent is the only authority that is controlling under AEDPA, we look to Ninth Circuit case law as 'persuasive authority for purposes of determining whether a particular state court decision is an "unreasonable application" of Supreme Court law.'" *Luna v. Cambra,* 306 F.3d 954, 960 (9th Cir.2002) (quoting *Van Tran v. Lindsey,* 212 F.3d 1143, 1154 (9th Cir. 2000), *overruled in part on other grounds by Lockyer v. Andrade,* 538 U.S. 63, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003)). "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Miller–El,* 123 S.Ct. at 1041; 28 U.S.C. § 2254(e)(1). A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller–El,* 123 S.Ct. at 1041; 28 U.S.C. § 2254(d)(2).

 We review the district court's denial of an evidentiary hearing for abuse of discretion, *Lawson v. Borg,* 60 F.3d 608, 611 (9th Cir.1995), and review the district court's grant of summary judgment de novo, *Lessard v. Applied Risk Mgmt.,* 307 F.3d 1020, 1023 (9th Cir.2002). The petitioner carries the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Silva v. Woodford,* 279 F.3d 825, 835 (9th Cir.2002).

## Guilt Phase

### I. Impermissible Joinder

Davis argues that the trial court's denial of his motion to sever the capital charges

related to Holman from the non-capital charges relating to Suzanne H. violated his due process rights. The California Supreme Court held that it was not an abuse of discretion for the trial court to allow all counts to be tried together.

 We may grant habeas relief on a joinder challenge only "if the joinder resulted in an unfair trial. There is no prejudicial constitutional violation unless 'simultaneous trial of more than one offense ... actually render[ed] petitioner's state trial fundamentally unfair and hence, violative of due process.'" *Sandoval v. Calderon,* 241 F.3d 765, 771–72 (9th Cir.2001), *cert. denied,* 534 U.S. 847, 122 S.Ct. 112, 151 L.Ed.2d 69 (2001) and *cert. denied,* 534 U.S. 943, 122 S.Ct. 322, 151 L.Ed.2d 241 (2001) (quoting *Featherstone v. Estelle,* 948 F.2d 1497, 1503 (9th Cir.1991)) (omissions and modifications in original). The requisite level of prejudice is reached only "if the impermissible joinder had a substantial and injurious effect or influence in determining the jury's verdict." *Sandoval,* 241 F.3d at 772 (citing *Bean v. Calderon,* 163 F.3d 1073, 1086 (9th Cir.1998)). In evaluating prejudice, the Ninth Circuit focuses particularly on cross-admissibility of evidence and the danger of "spillover" from one charge to another, especially where one charge or set of charges is weaker than another. *See, e.g., Sandoval,* 241 F.3d at 772; *Bean,* 163 F.3d at 1084.

 As the California Supreme Court noted, Davis "concede[d] [that] the evidence in support of the offenses against Holman and Suzanne H. was cross-admissible on the issues of identity and intent." [2] *Davis,* 10 Cal.4th at 508, 41 Cal.Rptr.2d

---

**2.** Although Davis disputes such a concession, he did not argue lack of cross-admissibility to the California Supreme Court and, in any event, the court's decision rested on the code of evidence rather than the disputed admission.

826, 896 P.2d at 142; *see also* Cal. Evid. Code § 1101(b) (evidence that person committed crime admissible to prove fact other than disposition to commit act). The incidents were similar in nature, occurred only a few hours apart, and were in close geographic proximity.

Moreover, the State did not join "a strong evidentiary case with a much weaker case in the hope that the cumulation of the evidence would lead to convictions in both cases." *Sandoval,* 241 F.3d at 772. The weight of evidence in the Holman and Suzanne H. cases was roughly equivalent. The Holman case turned entirely on circumstantial evidence, although the physical evidence against Davis—including the serological results and the shard of windshield found in his shirt pocket—was very strong. The Suzanne H. charge rested on Suzanne H.'s own direct testimony—a narrative that the jury found more credible than Davis's. If anything, the physical evidence made for a stronger case on the Holman capital charges than on the noncapital charges involving Suzanne H.

■■■ Notably, any prejudice was further limited through an instruction directing the jury to consider each count separately. *See United States v. Lane,* 474 U.S. 438, 450 n. 13, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986) (concluding, in a case regarding misjoinder of defendants, that a "carefully crafted limiting instruction" may reduce prejudice "to the minimum" and that"[w]e cannot necessarily assume that the jury misunderstood or disobeyed such instructions" (internal citations and quotation marks omitted)). Although such jury instructions can pose difficulties by asking juries to "compartmentalize damaging information about one defendant derived from joint counts," the instructions have a better chance of effectiveness "when the evidence of each crime is simple and distinct, even in the absence of cross-admissi-

bility." *Bean,* 163 F.3d at 1084–85. The same holds true where two different charges are joined for trial. The evidence here was not only cross-admissible, but distinct and straightforward. The two counts were not improperly joined.

## II. SUFFICIENCY OF THE EVIDENCE ON PRE-MEDITATION

■■■ Davis next challenges his conviction on due process grounds, claiming that there was insufficient evidence of premeditation and deliberation to support a first-degree murder conviction. Davis faces a considerable hurdle on this claim. The jury's finding must stand if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Significantly, our court, "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326, 99 S.Ct. 2781.

■■■ We apply the *Jackson* standard "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n. 16, 99 S.Ct. 2781. Under California law, "[a] verdict of murder in the first degree ... is proper only if the slayer killed 'as a result of careful thought and weighing of considerations; as a *deliberate* judgment or plan; carried on coolly and steadily, [especially] according to a preconceived design.' " *People v. Caldwell,* 43 Cal.2d 864, 869, 279 P.2d 539, 542 (1955) (citations omitted). "Deliberation" and "premeditation" must be construed to require "more reflection than may be involved in the mere forma-

tion of a specific intent to kill." *People v. Anderson,* 70 Cal.2d 15, 26, 73 Cal.Rptr. 550, 447 P.2d 942, 949 (1968).

*Anderson* explains that in reviewing verdicts of first-degree murder, the court looks to evidence of (1) planning, (2) motive, and (3) facts "from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have [had] ... a 'preconceived design'" that the jury may infer from either motive or planning. 70 Cal.2d at 26–27, 73 Cal.Rptr. 550, 447 P.2d at 949. Such verdicts are typically sustained "when there is evidence of all three types"; otherwise, there must be "at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)."[3] 70 Cal.2d at 27, 73 Cal.Rptr. 550, 447 P.2d at 949.

■ In accord with California law, the trial judge instructed the jury almost verbatim from the California model jury instructions:

> The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances. The true test is not the duration of time, but rather the extent of the reflection.... To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, [he] decides to and does kill.

Although the jury certainly *could* have found that the crime did not rise to the level of first-degree murder, we cannot say under the *Anderson* framework that no rational trier of fact could have found that the Holman murder was deliberate and premeditated.

■ We focus first on the manner of killing—strangulation. Under California law, "when manner-of-killing evidence strongly suggests premeditation and deliberation, that evidence is enough, by itself, to sustain a conviction for first-degree murder." *Drayden v. White,* 232 F.3d 704, 709 (9th Cir.2000) (citing *Hawkins,* 10 Cal.4th at 957, 42 Cal.Rptr.2d 636, 897 P.2d at 595).

The unrefuted medical evidence on this point is compelling. Holman's injuries from the crash were extremely serious but were not the cause of her death. Even after the debilitating crash, she was apparently able to escape from the car. Her ultimate demise resulted from strangulation. To render her unconscious, Davis would have had to apply pressure deliberately and steadily for up to two minutes. Even in her weakened state, death by strangulation would have taken three to five minutes of continuous pressure. A rational juror could infer that there was nothing casual or accidental about the death and that the intent to keep Holman from escaping from the car plus the strangulation evidenced premeditation and deliberation. Whether viewed in isolation or in conjunction with the other evidence, the manner of killing evidence was sufficient to sustain the verdict. *See Anderson,* 70 Cal.2d at 27, 73 Cal.Rptr. 550, 447 P.2d at

**3.** We note the California Supreme Court's admonition, however, that the *"Anderson* analysis was intended only as a framework to aid in appellate review; it did not propose to define the elements of first degree murder .... The *Anderson* guidelines ... are not a definitive statement of the prerequisites for proving premeditation and deliberation in every case." *People v. Hawkins,* 10 Cal.4th 920, 957, 42 Cal.Rptr.2d 636, 897 P.2d 574, 595 (1995) (internal citations and quotation marks omitted).

949 (noting that evidence of a preconceived design coupled with a motive is sufficient to sustain first-degree murder verdict).

As the district court observed, this case also involves evidence falling within the other two *Anderson* categories—planning and motive. Evidence of planning arises from Davis's engineering the assaults on both Suzanne H. and Holman in isolated areas where they could not easily escape or seek help. A jury could also believe that Davis got into the car intending to have sex with Holman and, when she refused, devised a plan to forcibly rape, sodomize, and kill her.

As for motive, in discussing the topic of sex with "a dead girl," Davis reportedly told a jailhouse informant, "You got to get 'em before the body gets cold." A jury that believed the informant's testimony could infer that Davis intended to kill Holman so that he could have sex with her dead body or to eliminate the possibility of her reporting the rape or testifying against him. Given the evidence supporting all three *Anderson* factors, the district court did not err in concluding that there was sufficient evidence to sustain the special finding of premeditation.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

Davis seeks an evidentiary hearing on four claims of ineffective assistance of counsel in the guilt phase. We address each in turn and affirm the district court's denial of a hearing because Davis has not demonstrated that he is entitled to relief on any claim. *See Phillips v. Woodford*, 267 F.3d 966, 973 (9th Cir.2001) ("A habeas petitioner is entitled to an evidentiary hearing if [ ] the *allegations* in his petition would, if proved, entitle him to relief....").

Under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), to prevail on a claim of ineffective assistance of counsel, Davis must show that counsel's performance was deficient—that is, that it fell below an objective standard of reasonableness—and that "counsel's errors were so serious as to deprive the defendant of a fair trial." *Id.* at 687, 104 S.Ct. 2052.

### A. FAILURE TO IMPEACH PROSECUTION WITNESS

Davis first attacks defense counsel's failure to impeach Emanuel Manson. During cross-examination, Davis's counsel asked Manson whether he had been convicted of lying to a police officer. Manson admitted, outside the presence of the jury, that two years earlier he had lied to a police officer in connection with a misdemeanor traffic ticket. The trial judge sustained the prosecutor's objection because misdemeanor convictions are not admissible for impeachment purposes under California law. Davis's counsel could then have asked for permission to impeach Manson with the conduct underlying the misdemeanor, which was admissible, but he failed to do so. Both sides acknowledge that this mistake constituted ineffective assistance of counsel, violating the first prong of *Strickland*. The only issue is whether the mistake denied Davis a fair trial. We hold that it did not.

Defense counsel did impeach Manson's credibility on many other grounds, including inconsistencies in his testimony and his inability to remember whether he had been drinking on the night he saw Davis at the Safeway. When Manson refused to answer several questions, the judge instructed the jury that "you can draw whatever inferences regarding his credibility or lack of it from his refusal to answer a direct order from me to answer what I feel to be a relevant question in this trial." The jury was thus on notice that Manson's credibility was at issue and defense coun-

sel further highlighted that fact through effective questioning.

More importantly, it is almost impossible to believe that a jury—already aware that Manson's credibility was an issue—would have decided the guilt phase differently had it known that Manson lied in connection with a traffic ticket issued a year before the murder occurred and two years before Davis's trial. We therefore conclude that counsel's failure to introduce Manson's conduct did not prejudice the outcome of Davis's trial.

### B. FAILURE TO INTRODUCE DAVIS'S STATEMENT TO INVESTIGATORS

■ Before trial, Davis recounted his version of the events in a tape-recorded statement to defense investigators. At trial, Davis testified that he had spoken with the investigators, and defense counsel pointed out in his closing argument that Davis "had already told his story" and thus did not invent his explanation after hearing the prosecution's testimony. However, defense counsel never introduced into evidence Davis's statement or any other testimony that the statement had been given. The prosecutor thus was able to point out in rebuttal that defense counsel's claim was uncorroborated.

Whether or not counsel's failure to introduce this evidence constituted ineffective assistance, it did not prejudice the trial. As documented by the sequence of other evidence, Davis gave his statement to investigators after both hearing the prosecution arguments at the preliminary hearing and seeing a police report about the murder. Even if the statement and its timing were in evidence, the prosecution could have rebutted it by pointing out that Davis already knew the broad outlines of the prosecution's case by the time he made his statement. Davis's *Strickland* claim therefore fails.

### C. PRESENTATION OF "IRRELEVANT" TESTIMONY

■ The first two witnesses for the defense were Tammy Kay Thompson and Cecilia Taylor. Each testified that, in the spring or summer of 1989, she had been harassed or assaulted by a black man; based on composite sketches of Davis, each woman testified that he could have been the perpetrator. Both incidents, however, occurred while Davis was in custody. Defense counsel used the witnesses to emphasize that victims often make mistakes in identification. Davis claims that his counsel was ineffective for offering these witnesses because the identification issue was irrelevant to his defense. He argues that this strategy made the defense appear "desperate" and opened up the testimony to potshots from the prosecution.

This claim fails under the first prong of *Strickland*. In addition to arguing that sex crime victims often make mistakes in identifying their assailants, defense counsel argued in closing that witnesses "can also be mistaken about all kinds of other things that [they] see and hear" and he gave examples of some of the mistakes that various witnesses might have made. Counsel's presentation of this pair of witnesses was part of a reasonable trial strategy, albeit one subject to criticism and after-the-fact second-guessing. *See Siripongs v. Calderon*, 133 F.3d 732, 736 (9th Cir.1998) (holding that "the relevant inquiry under Strickland is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable").

### D. FAILURE TO EXERCISE PEREMPTORY CHALLENGES

■ Davis's final ineffective assistance of counsel claim stems from defense counsel's decision not to challenge the seating

of two jurors despite having unused peremptory challenges. Establishing *Strickland* prejudice in the context of juror selection requires a showing that, as a result of trial counsel's failure to exercise peremptory challenges, the jury panel contained at least one juror who was biased. *United States v. Quintero–Barraza*, 78 F.3d 1344, 1349 (9th Cir.1995). "The Supreme Court has suggested that the relevant test for determining whether a juror is biased is 'whether the juror[ ] .... had such fixed opinions that [he] could not judge impartially the guilt of the defendant.'" *Id.* (quoting *Patton v. Yount*, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984)) (alterations in original).

■ The jurors' answers to the voir dire questions demonstrate that they did not hold fixed views on the death penalty or on Davis's guilt. Each professed a belief in the presumption of innocence and a willingness to follow the judge's instructions and decide the case impartially. One of the jurors, an FBI fraud investigator, said that he believed in the death penalty under certain circumstances but had "mixed emotions" about it. He stated that he could be honest and could be a critic of law enforcement handiwork, but also said that he had "a lot of admiration for the various law enforcement officers." The other juror, an emergency-room nurse, related that her daughter was addicted to cocaine and had been raped seven months before trial, and that her son had been raped three years earlier. She also revealed "what I consider to be ambivalent feelings about the death penalty," and agreed that the burden of proof "is and ought to be on the accuser in a case like this."

These statements do not demonstrate actual or implied jury bias. Rather, the comments reflect that the jurors were, appropriately, grappling with their feelings about the death penalty, and that they intended to approach the evidence with an understanding of the proper allocation of burdens in a criminal case. We cannot say that counsel was deficient in declining to exercise peremptory challenges.

## IV. PROSECUTORIAL VOUCHING

■ Finally, Davis alleges that the prosecutor improperly vouched for a witness's credibility. Fernando Moreno, an inmate trustee at the jail where Davis was housed awaiting trial, testified that he had a conversation with Davis in which Davis made statements implying that he was involved in Holman's murder and that he preferred anal sex—the kind apparently forced upon Holman—to vaginal intercourse. In exchange for his testimony, Moreno entered into a plea agreement and received a recommendation that he be allowed to attend the birth of his second son.

The prosecution introduced the unredacted plea agreement, which read in part: "Based on our interview with Fernando Moreno, careful consideration of his prospective testimony and *belief that the information he has provided is truthful and accurate,* we would like to use him as a witness in the forthcoming trial of People versus Larry Davis" (emphasis added).

During a recess in the trial, Davis's lawyer objected to the phrase "and belief that the information he has provided is truthful and accurate." He acknowledged that the jury had already heard the phrase, but asked that it be redacted from the exhibit that would be in the jury room. At the end of the day's testimony, the judge gave a curative instruction, referring the jury to the offending language and telling them, "I am actually going to just line it out and admonish you to disregard or delete that portion of the memorandum from the testimony and from the exhibit from [ ] your

mind, not to be considered as evidence by you as to what the parties believed."

To warrant habeas relief, prosecutorial misconduct must "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (citation and internal quotations omitted). Here we need not get tangled in the issue of whether use of the unredacted agreement rises to the level of vouching. Although counsel's initial failure to object may have been an unfortunate lapse, it was without significant consequence. Counsel did in fact object at the next break, and the trial judge not only redacted the offending language from the exhibit but gave a curative instruction. This was not a case in which there was an "overwhelming probability that the jury[would] be unable to follow the court's instructions" and "a strong likelihood that the effect of the evidence would be devastating to the defendant." *Greer v. Miller*, 483 U.S. 756, 766 n. 8, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987) (citations and internal quotation marks omitted). Davis has not succeeded in demonstrating that the prosecutor's reading of the plea agreement rendered his trial fundamentally unfair.

## PENALTY PHASE

### I. FAILURE TO HOLD A COMPETENCY HEARING

Davis makes three claims related to his competency during the penalty phase: He argues that the trial court erred in not *sua sponte* holding a competency hearing at the penalty phase (a procedural incompetence claim); that he was actually incompetent at the time of the penalty phase (a substantive incompetence claim); and that his trial counsel rendered ineffective assistance of counsel by not requesting a competency hearing. We hold that because the trial court did not err in declining to hold a competency hearing and because Davis was in fact competent, the district court did not abuse its discretion in declining to hold an evidentiary hearing on the issues and counsel did not err in failing to request a competency hearing.

### A. PROCEDURAL INCOMPETENCE

Over a quarter of a century ago, we offered a succinct benchmark for review of the precise issue raised by Davis: "The question to be asked by the reviewing court is whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial." *de Kaplany v. Enomoto*, 540 F.2d 975, 983 (9th Cir.1976) (en banc). A defendant must show that there was "substantial evidence" that he was mentally incompetent to stand trial. *Moore v. United States*, 464 F.2d 663, 666 (9th Cir.1972). Only when "the evidence raises a 'bona fide doubt'" about the defendant's competence to stand trial must a trial judge *sua sponte* conduct an evidentiary hearing. *Pate v. Robinson*, 383 U.S. 375, 385, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). "The state trial and appellate courts' findings that the evidence did not require a competency hearing under *Pate* are findings of fact to which we must defer unless they are 'unreasonable' within the meaning of 28 U.S.C. § 2254(d)(2)." *Torres v. Prunty*, 223 F.3d 1103, 1105 (9th Cir.2000) (citing *Maggio v. Fulford*, 462 U.S. 111, 117, 103 S.Ct. 2261, 76 L.Ed.2d 794 (1983) (per curiam)).

"To be competent to stand trial, a defendant must demonstrate an ability to consult with his lawyer with a reasonable degree of rational understanding and a rational as well as factual understanding of

the proceedings against him." *Douglas v. Woodford*, 316 F.3d 1079, 1094 (9th Cir. 2003). In reviewing whether a state trial judge should have *sua sponte* conducted a competency hearing, we may consider only the evidence that was before the trial judge. *Williams v. Woodford*, 306 F.3d 665, 702 (9th Cir.2002); *see also id.* ("Although no particular facts signal a defendant's incompetence, suggestive evidence includes the defendant's demeanor before the trial judge, irrational behavior of the defendant, and available medical evaluations of the defendant's competence to stand trial."). Because the trial judge was not faced with substantial evidence of Davis's incompetence—and in fact had good reason to think that Davis was competent—he did not err in failing to hold a competency hearing.

### 1. BEGINNING OF PENALTY PHASE

Although there is little doubt that Davis was recalcitrant and acted in ways that were detrimental to his case, his interactions with the trial judge indicated that he understood what was at stake during the penalty phase and could make informed decisions.

■ On the first day of the penalty phase, Davis's counsel informed the judge that Davis had waived his right to be present for the penalty phase. When the judge objected to such a blanket waiver, Davis told the judge that, according to his research in the jail law library, "[the law] only says I have to be present at court, not present and at counsel table at any time of my hearing or during the trial." The judge agreed to allow him to sit in the doorway of the courtroom with one of his attorneys.

The next day, the judge began the proceedings by soliciting and getting Davis's explicit waiver of his right to sit at the counsel table and to confront witnesses from the counsel table. When Davis's counsel informed the judge that Davis refused to wear civilian clothes or to sit in the courtroom, the judge asked Davis whether he was rejecting his attorneys' advice. Davis responded that he was doing so intentionally because "I don't like sitting here listening to lies about me. I feel if I sit over there [in the doorway], the[re] will be less problems and I am happy to sit over there so [the jurors] don't sit here and look at me getting mad because I have to listen to the lies...."

The judge told Davis that he was particularly concerned that Davis's absence from the counsel table would make it easier for the prosecutor to convince the jury to impose the death penalty. Davis responded that he had been thinking about that issue, and that

> the problem is how am I suppose to sit here like the lawyers say I'm suppose to have a straight face, don't show no, like I'm mad or anything.... It's been hard all through the trial to listen to these people when I know different, and then I still got to sit here after I know I'm going to prison for the rest of my life or getting the gas chamber, how am I suppose to sit here and keep a straight face? I can't do it. I just can't.

When the judge acknowledged that it would be "devastating" if Davis did something in front of the jury that could be construed as violent, Davis repeated that "I just want to try and avoid problems. That is all I am trying to do."

Davis's decision not to wear civilian clothes and to remain in the doorway of the courtroom rather than facing the prosecution witnesses may seem an unreasonable decision for someone on trial for his life. He was evidently aware of the risks of his behavior, however, and rationally weighed those risks against the likelihood

that, if he remained in the courtroom, he would do something to increase further his chances of being sentenced to death. *See Douglas,* 316 F.3d at 1094 (concluding that defendant's "coheren[ce][and] responsive[ness]" and understanding of "the significance of the ... penalty phase" during colloquy with trial judge indicated that defendant was competent during trial). We conclude that the trial judge did not err in proceeding without a competency hearing at the beginning of the penalty phase.

### 2. DURING PENALTY PHASE

Davis also argues that a hearing should have been held during the penalty phase because his mental status deteriorated during that time. The trial court judge was in a position to gauge whether a competency hearing would be in order. The judge continued to interact with Davis every morning and every afternoon, asking whether Davis still wanted to be in the doorway or if he wanted to join his attorneys at the counsel table. Several times Davis did choose to sit at the counsel table rather than in the doorway, affording the judge a closer look and the opportunity to determine whether Davis was able to make rational choices about his participation in his own trial. The judge's "ab[ility] to observe[Davis] in the context of the trial" therefore allowed him "to gauge from [Davis's] demeanor [that Davis] was able to cooperate with his attorney[s] and to understand the nature and object of the proceedings against him." *Drope v. Missouri,* 420 U.S. 162, 181, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975).

Moreover, although the Supreme Court cautioned in *Pate* against relying on "demeanor at trial ... to dispense with a hearing" on competence, 383 U.S. at 386, 86 S.Ct. 836, the Court was faced in that case with a defendant who, among other things, had had a brick dropped on his head when he was young, often stood "in a daze," and, according to his mother, "lost his mind." *Id.* at 378–79, 86 S.Ct. 836; *see also Odle v. Woodford,* 238 F.3d 1084, 1089–90 (9th Cir.2001) (holding that it was error not to conduct competency hearing where petitioner had suffered severe trauma to his brain as a result of a car accident and had a 3 × 3 × 4–inch piece of his brain removed, and had a long subsequent history of psychiatric hospitalization and bizarre behavior); *Torres, supra* (concluding that district court erred by not holding competency hearing where court-appointed psychiatrist had diagnosed the petitioner as having a severe delusional (paranoid) disorder, testing indicated that the petitioner had brain damage resulting from head trauma, and petitioner had disruptive outbursts in court). Davis may have been depressed, but his history, statements, and conduct did not approach the overwhelming indications of incompetence present in *Pate, Odle,* and *Torres.* The judge was not confronted with "substantial evidence" that Davis was incompetent to stand trial, *Moore,* 464 F.2d at 666, nor was there evidence to suggest that the judge "should have experienced doubt with respect to competency to stand trial," *de Kaplany,* 540 F.2d at 983. We therefore conclude that the trial judge did not err in declining to hold a competency hearing.

### B. SUBSTANTIVE INCOMPETENCE

Davis's Sixth Amendment right to a fair trial would nevertheless have been implicated if he had actually been incompetent during the penalty phase. *See Cacoperdo v. Demosthenes,* 37 F.3d 504, 510 (9th Cir.1994) (holding that conviction of legally incompetent defendant violates due process, but no competency hearing required unless court has good faith doubt concerning competence). For much the same reason that the trial court had no

substantial evidence of incompetence, we cannot glean evidence from the record to support actual incompetence. Davis's behavior reflects that he had the present ability to consult with his attorneys. He also understood the nature of the proceedings; he was able to weigh the danger of absence from the jury against the danger of the jury's observing his demeanor, and he understood that he was going to be sentenced to life without parole or to death.

Davis argues that several events during the penalty phase are evidence of his incompetence. First, he insisted on attending the penalty phase proceedings in a wheelchair, despite no apparent physiological cause for his inability to walk. Second, he claimed that his depression was further exacerbated by abuse allegedly suffered at the hands of the jail deputies. The evidence, however, fails to bear out his claims that either fact evidenced or caused incompetence during the penalty phase.

First, although his court-appointed psychiatrist, Dr. William Vicary, testified that Davis had a hysterical conversion disorder—in which Davis's anxiety about being on trial was being transferred into a belief that he could not get out of his wheelchair—and that he and the jail physician had discussed putting Davis on psychiatric medication, Dr. Vicary gave no indication that he thought Davis was not competent to participate in the proceedings. In addition, although Davis's penalty phase consultant, with whom Davis had a poor rapport, stated in her post-trial deposition testimony that Davis became "hysterical and unfocusable" near the end of their interviews, her testimony reflects that his behavior probably resulted from his anger towards her, his attorneys, and the entire process. It did not reflect on his competency.

Davis also points to a declaration Dr. Vicary submitted seven years after the trial in which he stated that Davis's appearance in court was "terrible" and that due to Davis's lack of cooperation with counsel, he "viewed Mr. Davis as marginal, in the gray area between competency and incompetency." Dr. Vicary went on to add that "if several psychiatrists had examined Mr. Davis during the penalty phase, at least a few of them would have found Mr. Davis to be incompetent." Significantly, however, Vicary did not see fit to place himself within the company of those few psychiatrists. His comments must be evaluated for what they are—rank speculation rather than evidence. *See also Douglas*, 316 F.3d at 1094 (noting the district court's holding that psychiatric opinions rendered years before and years after trial did not "suffice to raise a 'real and substantial' doubt" as to defendant's competence at the time of trial "in light of other contemporaneous and objective indications of competence").

In light of our evaluation of the substantive competence claim, Davis's claim that his trial attorneys rendered ineffective assistance of counsel by failing to move for a competency hearing in the trial court also fails.

## II. Ineffective Assistance of Counsel—Dr. Vicary's Testimony

Davis argues that defense counsel's presentation and handling of Dr. Vicary constituted ineffective assistance of counsel. His concerns date from counsel's initial decision to put Dr. Vicary on the stand. Dr. Vicary cautioned the defense attorneys before the penalty phase that, in order to bolster his credibility with the jury, his practice was to offer candid and possibly damaging information from the stand. That warning, coupled with similar warnings from several other public defend-

ers, led Davis's attorneys to request additional time to secure a psychiatrist who would provide less ammunition for the prosecution. When the trial judge refused to grant a continuance, defense counsel chose to use Dr. Vicary rather than forgo any testimony from a psychiatric expert.

On the stand, Dr. Vicary, true to his word, offered extensive and detailed testimony. In answer to several broadly worded questions from defense counsel, the psychiatrist volunteered multiple facts about, among other things, the murder, Davis's criminal background, and his problems in juvenile hall. Dr. Vicary interpreted the results of a psychological evaluation—the Minnesota Multiphasic Personality Inventory (MMPI)—as indicating that Davis had Anti–Social Personality Disorder (ASPD), and characterized Davis as being intense, shallow, impulsive, and prone to violent episodes. Dr. Vicary even testified that he believed, out of respect for the jury's verdict and after reading thousands of pages of documents, that Davis was lying and did murder Holman.

Dr. Vicary also provided some important and unique mitigating testimony, however. He testified about Davis's expression of remorse, provided a psychological explanation for Davis's behavior the night of the murder, detailed a list of mitigating factors, and stated that despite Davis's ASPD, he would do well in a prison setting that provided him with some structure, in which he could become a model for other prisoners and even a trustee or teacher's aide.

On cross-examination, the prosecutor made some headway in undermining Dr. Vicary's positive testimony. When the prosecutor asked Dr. Vicary if he wanted to "take a crack" at listing possible aggravating factors, Davis's counsel objected only jestingly—so jestingly that the court did not even rule on the objection—and

Dr. Vicary listed a number of aggravating elements, including that Holman was "young," "innocent," and "didn't deserve to die."

On redirect, defense counsel was able to put much of Dr. Vicary's testimony in perspective. Dr. Vicary agreed that evaluating someone solely on the basis of the MMPI would constitute malpractice. He also agreed that a subject's performance on the test could be affected by a number of factors, including his comfort with the person administering the examination. Dr. Vicary suggested that Davis might not have committed the murder had his mother's indifference to her children's welfare not thwarted appropriate juvenile intervention. Finally, Dr. Vicary testified that Davis could likely be helped by the medication and psychological counseling he would receive in a prison psychological medical unit.

Counsel exercised appropriate professional judgment in choosing to put Dr. Vicary on the stand despite the prospect that he might offer damaging information. When the effort to postpone the penalty phase and bring in a new psychiatric expert failed, defense counsel quite reasonably decided that the risk of a slight unknown was preferable to presenting no psychiatric testimony. Precisely because Davis's background was susceptible to leverage as a result of abuse, poverty, drugs, or other factors, Davis needed someone who could nevertheless put together the pieces to demonstrate, as Dr. Vicary did, that Davis was not entirely a creature of his own making, that he had psychological problems, and that hope existed for some type of rehabilitation.

The fact that counsel had concerns about what Dr. Vicary might say on the stand is a far cry from the kind of professional incompetence evidenced by initiating contact with a psychiatric expert just days

before trial, *see Clabourne v. Lewis*, 64 F.3d 1373, 1387 (9th Cir.1995) (ultimately holding that counsel's "representation at the sentencing hearing 'amount[ed] in every respect to no representation at all'" (citation omitted) (alteration in original)), or asking a defendant to switch into his alternate personality on the stand with no idea what he might offer up, *see Wade v. Calderon*, 29 F.3d 1312, 1323–24 (9th Cir. 1994). Indeed, allowing Dr. Vicary to testify candidly about the negatives may have served to enhance the psychiatrist's credibility on other points.

Significantly, most of the adverse evidence offered by Dr. Vicary was already in front of the jury. The jury knew that Davis had committed offenses as a juvenile and that he had been involved in domestic violence incidents. The jury itself had already come to the conclusion that Davis killed Holman; that decision was what brought them to the penalty phase. Had Dr. Vicary suggested that their decision was in error, the jury might well have discounted his mitigating testimony.

Dr. Vicary also gave the jurors their only clear sign that Davis might be able to function well in an institutional setting. Although the crime that Davis committed was brutal and sexual in nature, Dr. Vicary testified that Davis could survive and even thrive in a setting in which he was provided with structure and sympathy.

Even the ASPD diagnosis was not substantially prejudicial. Any psychiatrist that Davis used would have read the same psychological report and likely come to the same conclusion. Counsel did a reasonable job on redirect of mitigating the effects of the diagnosis.

Davis also argues that Dr. Vicary's testimony on aggravating factors was inadmissible because there was no foundation for his opinion, the testimony was beyond the scope of the direct, and the evidence was

irrelevant. His claim is unavailing. The California Supreme Court found that the testimony was neither beyond the scope of direct examination nor irrelevant. Foundation stemmed from Dr. Vicary's review of the materials on which he based his mitigating testimony. Because the prosecutor was entitled under California law to elicit Dr. Vicary's opinion on aggravating factors, defense counsel's failure to lodge a serious objection to the prosecutor's question was neither ineffective assistance of counsel nor prejudicial.

Dr. Vicary did a more than adequate job of taking the strands provided by the lay witnesses and weaving together a sympathetic psychiatric portrait. The possibility that cross-examination might diminish the force of his testimony was inevitable. Because Davis's counsel made an informed choice to put Dr. Vicary on the stand and had access to materials that should have alerted them to his diagnosis, and because Dr. Vicary was able to provide mitigating testimony across a range of areas, the decision to use Dr. Vicary neither constituted ineffective assistance of counsel nor substantially prejudiced the outcome of the penalty phase of Davis's trial.

## III. OTHER INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

### A. SHARON BRUBAKER'S TESTIMONY

■ The defense called Davis's former probation officer, Sharon Brubaker, who had written a diversion report six years before on a domestic violence incident involving Davis and his then wife, Laura King. Brubaker testified that the circumstance was an appropriate one for diversion, whereby Davis would have been shunted to a domestic violence program rather than going through formal proceedings, but that she had recommended that Davis not be diverted due to his prior

record, including his juvenile incidents. The prosecutor used Brubaker's reference to Davis's criminal record as a platform to recount Davis's criminal infractions. Davis contends that the decision to put Brubaker on the stand constituted ineffective assistance of counsel.

On direct and redirect, counsel clarified and minimized Brubaker's potentially damaging testimony by highlighting her views that the violence toward King was more minor than King reported; that the violent incidents in Davis's history were few and far between; and that the last offense had occurred five years before Holman's murder. The main incident that persuaded Brubaker not to divert Davis was one in which he broke a window while drunk— hardly an offense that would persuade a jury to impose death.

Counsel also elicited on redirect that Davis had no felony convictions as an adult; his only adult crimes prior to the murder were the incident for which she evaluated him and the broken window. Brubaker's report also supported Dr. Vicary's argument that Davis had been deprived of some opportunities to turn his life around since Davis could have received diversion and did not. Finally, the testimony was partially cumulative, as King had already testified about the worst incident—the domestic violence offense. itself—and the jury already knew that Davis had committed juvenile offenses. The tactical decision to call Brubaker cannot be characterized as ineffective assistance of counsel.

### B. Failure to Introduce Additional Lay Witnesses

■ During the penalty phase, Davis's counsel introduced fourteen mitigation witnesses. Defense investigators interviewed fifteen other witnesses. Davis faults his counsel for failing to call those additional mitigation witnesses.

The district court chose not to hold an evidentiary hearing on this issue because Davis failed to allege the specific mitigating evidence the witnesses would have presented. Characterizing as "conclusory" Davis's allegations regarding the additional information that those potential witnesses might offer, the court held that Davis's notice pleading was insufficient. *See O'Bremski v. Maass*, 915 F.2d 418, 420 (9th Cir.1990). We agree and further note that even if counsel had called the additional witnesses, their testimony would have been either negative or cumulative. Finally, as to seven of the witnesses, Davis failed to raise this claim in state court, and is therefore precluded from pursuing it here.

### C. "Rude and Hostile" Closing Argument

■ Davis's two defense attorneys split the closing argument at the end of the penalty phase. Davis maintains that the first closing argument so annoyed and angered the jury that his sentence was affected. We reject his claim, and conclude that counsel's' actions neither constituted ineffective assistance of counsel nor prejudiced the outcome of the penalty phase.

The first defense attorney began his closing argument by saying, "We will start right out with a comment that I have a strong belief that some of you have already decided this phase of the case to yourselves and to those, probably ... nothing I can say is going to have any particular value." Counsel took issue with the jury's decision in the guilt phase, saying, "I would like to talk about Davis [ ] from a standpoint of someone who does not believe that the evidence in this case was sufficient to just[ify] your verdict pre-

viously rendered but with an acceptance that that is the way it is." Counsel further told jurors, "Now you can poo-poo and shake your head and give me that 'BS' look if you wish, and that is fine." Finally, counsel told the jury, "You're going to make your decision regardless of what any of us say here and I'd like you to consider a couple of points."

These statements were part of a closing argument spanning fifty pages. Counsel spent most of his time summarizing the case and asking the jury not to impose the death penalty. Although counsel's language appeared to denigrate the jurors' guilt-phase decision, his choice of words could equally have been a legitimate trial strategy of challenging the jurors to recognize the import of their guilt-phase decision and the significance of the determination they were about to make.

 In addition, these remarks were countered by co-counsel, who made a point of telling the jury that "I take it that you did your job sincerely and as honestly as you could, as you swore you would do earlier when you were all picked to serve on this jury, and that you followed the law and that's what you did. And I respect that." He later added, "I ... disagree with Mr. Maxwell—respectfully so—that I don't believe any one of you have made up your minds at this point."

We acknowledge that, however perceived, the strategy may seem unusual on the written record. Nonetheless, in view of the strong evidence in the penalty phase, the legitimate and substantive arguments made by both counsel, and the second counsel's mitigation efforts, we conclude that the closing argument does not demonstrate the prejudice required under *Strickland,* 466 U.S. at 695, 104 S.Ct. 2052 (holding that to demonstrate prejudice, a petitioner must demonstrate "a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death").

## IV. CLAIMED JURY BIAS

After instructing the jury but before deliberations, the court received a note from R.C. Schwartz, the foreman during both phases of the trial. The note read:

Question One: If we cannot come to unanimous agreement on the penalty phase for the defendant, what will happen next?

Question Two: If we decide on the gas chamber as penalty, is there any reason that we should expect that his punishment will ever actually occur in California?

Three: If we decide on life without parole as penalty and our original verdict of guilty is not overturned, will the defendant actually spend life in prison without parole or can he later be paroled by some higher authority?

Four: Can you describe the impact on the legal system (and taxpayers) which would likely occur for either of the two penalty decisions? In other words, it has been said that the death penalty decision results in millions of dollars of legal expense for the taxpayers of California due to appeals, et cetera. In the end the penalty is not administered.

Five: Can you reassure us that this phase is not just a legal formality and that the result of our deliberation will really have some significance in seeing that justice will prevail?

Six: It is my impression that a death penalty sentence will actually result in life without parole; a life without parole sentence will not stick, i.e., the defendant will later be paroled. Can you comment on this?

[Unrelated seventh question omitted.]

It was not clear whether the note was from Schwartz only or from some larger faction of the jury. Davis's counsel asked the court to dismiss Schwartz and to inquire whether any of the jurors had discussed the case or the law. The judge denied the request and reasoned that, because the California Supreme Court had in similar situations approved curative instructions, it would be unreasonable to conclude that the note indicated an incurable impropriety. When the jury convened the next morning, prior to the final two closing arguments, the judge briefly mentioned the note and then gave the jury the following comprehensive explanatory instructions, taken directly from *People v. Hunter,* 49 Cal.3d 957, 981–82, 264 Cal. Rptr. 367, 782 P.2d 608, 621–22 (1989) (approving of a trial judge's decision to answer jury questions with instructions on commutation, the effect of a life sentence, and the jurors' duties):

Ladies and gentlemen, you are instructed that under the Constitution of the State of California, a governor is empowered to grant a reprieve, pardon or commutation after sentence following the conviction of any crime.

Under this power the governor in the future may commute or modify a sentence of death or a sentence of life without possibility of parole to a lesser sentence, including a sentence which includes the possibility of parole.

A sentence of life without possibility of parole means that the defendant will spend the remainder of his natural life in prison; therefore, the matter of parole is not to be considered by you in determining the punishment for the defendant.

If upon consideration of the evidence you believe that life without possibility of parole is the proper sentence, you must assume that those officials charged with the operation of our prison system will perform their duties in that regard in a correct and responsible manner.

It would be a violation of your duty as jurors if you were to fix the penalty at death because of a doubt that the prison authorities or the governor of the state will properly carry out their responsibilities.

Likewise, it would be a violation of your duty as jurors if you were to consider cost to the taxpayers and other impacts on the legal system or the prison system in determining the appropriate punishment; therefore, you are limited to those matters which are properly before you in this case which have been brought to your attention by the evidence and by the instructions of the Court and you are not to consider matters that are not properly before you by the evidence or the instructions of the Court.

Several months after the trial ended, Schwartz wrote a letter to a Ventura County newspaper approving of the outcome in the trial. Davis alleges that the questions Schwartz submitted to the judge in combination with his letter demonstrated a pro death penalty bias. Davis also contends that the use of the pronoun "we" in the questions raised the inference that the jury may have discussed the case before submission. Davis therefore argues that the trial judge should have conducted an inquiry, that the letter established bias, and that the proper remedy is to remand for an evidentiary hearing before the district court or a retrial of the penalty phase.

The Ninth Circuit takes the spectre of jury bias very seriously. We have emphasized that "even a single partial juror violates a defendant's constitutional right to fair trial." *United States v. Angulo,* 4 F.3d 843, 848 (9th Cir.1993). We have also admonished that "[a] court confronted with

a colorable claim of juror bias must undertake an investigation of the relevant facts and circumstances." *Dyer v. Calderon,* 151 F.3d 970, 974 (9th Cir.1998) (en banc).

 Were we to assume that premature deliberations occurred, such an exchange, though not necessarily proper, is not as serious as "private communication, contact, or tampering ... with a juror during a trial [or] ... influence of the press upon the jury," nor does "every incident of juror misconduct require[ ] a new trial." *United States v. Klee,* 494 F.2d 394, 396 (9th Cir.1974) (internal citations and quotation marks omitted). What is crucial is "not that jurors keep silent with each other about the case but that each juror keep an open mind until the case has been submitted to the jury." *Id.* Although a hearing might have laid to rest any lingering question about premature deliberations or bias, we do not construe the circumstances as mandating a hearing then or now. The judge's instructions were sufficient to cure any possible prejudice.

Just three years ago, we addressed virtually the identical issue in *Anderson v. Calderon,* 232 F.3d 1053 (9th Cir.2000). Prior to deliberations, one of the jurors submitted a note to the judge asking, "Does life without possibility of parole really mean that? Or can Anderson, under the sentence, at some future time be released?" *Id.* at 1098. As is the case here, we first noted that, although there was some evidence that the juror may have discussed the penalty with other jurors, it was not clear whether such communication had actually occurred. *Id.* Notwithstanding any possible juror misconduct, however, we concluded that Anderson's claim failed

> because there is absolutely no evidence that the alleged misconduct has prejudiced Anderson in any way, much less 'to the extent that he has not received a

fair trial.' Anderson does not contend that any of the jurors relied on evidence outside of the record in reaching their verdict, nor does he assert that any of the jurors actually decided on the death penalty before the case was submitted to them.

*Id.* at 1098–99 (quoting *Klee,* 494 F.2d at 396).

 Similarly, we see no evidence in Davis's case that any of the jurors relied on extrinsic evidence in reaching a death verdict, or that any of the jurors reached a sentencing determination prematurely. Davis "is entitled to a fair trial, but not a perfect one, for there are no perfect trials." *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 553, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984) (internal citations and quotation marks omitted). The trial court's decision not to hold a hearing on juror bias is not "inconsistent with substantial justice," *id.* (quoting Fed.R.Civ.P. 61), and the district court did not abuse its discretion in denying the request for an evidentiary hearing.

## V. CONFRONTATION CLAUSE

During cross-examination, the prosecutor showed Dr. Vicary a note from a jailhouse informant, which the judge admonished the jury was solely for impeachment purposes. In the note, the informant relayed that he had said to Davis, "Everyone says you killed her because she looked like your wife. Did you [think] it was your wife you were strangling?" According to the note, Davis replied, "Yeah, it should have been," and the two prisoners laughed. Dr. Vicary agreed that, assuming the note was accurate, Davis's response might be inconsistent with his feeling remorse over killing Holman. Davis argues that the use of the note—over defense counsel's objections—violated his Sixth Amendment right to confront witnesses.

This constitutional claim is procedurally barred because Davis raised only an evidentiary, not a constitutional, objection at trial. The California Supreme Court noted that Davis was raising his Sixth Amendment claim for the first time on appeal, and held that

> [i]t is, of course, the general rule that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal. The point is also meritless, since the note was not in fact admitted into evidence. The constitutional provisions are not substantially implicated.

*People v. Davis,* 10 Cal.4th at 531 n. 26, 41 Cal.Rptr.2d 826, 896 P.2d at 156 n. 26 (internal citations and quotation marks omitted).

■ When "a state prisoner has defaulted his federal claim in state court pursuant to an adequate and independent state procedural rule," federal habeas review is barred. *Vansickel v. White,* 166 F.3d 953, 957 (9th Cir.1999) (citing *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)). The California Supreme Court's opinion was the "last reasoned" opinion by a state court, *see Ylst v. Nunnemaker,* 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991), and its disposition of Davis's Confrontation Clause claim clearly rests on his procedural error in failing to raise the constitutional issue below. *See Harris v. Reed,* 489 U.S. 255, 263, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) ("[A] procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." (citation omitted)).

■ Because the California Supreme Court held that Davis's claim was procedurally barred under state law, he must demonstrate cause and prejudice to obtain habeas relief under state law. *Wainwright v. Sykes,* 433 U.S. 72, 90–91, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Davis has demonstrated neither. He offers no explanation for the failure to raise this issue in a timely fashion. In addition, the jury had already determined that Davis murdered Holman, and had heard testimony as damaging as the informant's note. Davis therefore has not established prejudice of a magnitude resulting in a fundamental "miscarriage of justice." *Schlup v. Delo,* 513 U.S. 298, 316, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).

## VI. Cumulative Error

■ Finally, Davis urges us to consider whether defense counsel's various errors rendered his trial cumulatively unfair, thus requiring reversal of both his conviction and death sentence. It is true that, although individual errors may not rise to the level of a constitutional violation, a collection of errors might violate a defendant's constitutional rights. *Harris v. Wood,* 64 F.3d 1432, 1438 (9th Cir.1995). The cumulative error doctrine does not aid Davis, however, because we are not faced with such a case. As our discussion of the ineffective assistance claims illustrates, Davis has not demonstrated prejudice as to the individual claims, and the nature of the claims does not support a conclusion of cumulative prejudice. Counsel's few missteps and misjudgments did not render Davis's trial fundamentally unfair, and the district court therefore did not err in failing to hold an evidentiary hearing on his cumulative error claim.

Because Davis has failed to satisfy AEDPA's standard for grant of habeas relief, the petition is **DENIED.**

BETTY B. FLETCHER, Circuit Judge, dissenting.

I originally concurred in the majority opinion. I continue to concur in the denial of guilt-phase relief. However, after close attention to the issues raised in the petition for panel rehearing and petition for en banc review, and a re-review of the relevant record, I confess error. I must and do here dissent from the majority opinion. The death penalty was wrongly imposed. As a threshold issue, I think there is a substantial question as to whether Davis was competent at the time of his penalty-phase trial. At a minimum Davis is entitled to an evidentiary hearing as to his competence.

Beyond that, after painstaking review of the penalty phase itself, I am persuaded that ineffective assistance of counsel probably affected the outcome, and that a juror's bias may have tainted the proceedings to the extent that the verdict was not the product of unbiased decision-making.

## I. SUBSTANTIVE INCOMPETENCE

Davis convincingly argues that he is entitled to an evidentiary hearing on his claim that he was incompetent during the sentencing phase.

### A. STANDARD FOR AN EVIDENTIARY HEARING[1]

"In a habeas proceeding, a petitioner is entitled to an evidentiary hearing on the issue of competency to stand trial if he presents sufficient facts to create a real and substantial doubt as to his competency, even if those facts were not presented to the trial court." *Boag v. Raines*, 769 F.2d 1341, 1343 (9th Cir.1985). "In a capital case, a habeas petitioner who asserts a colorable claim to relief, and who has never been given the opportunity to develop a factual record on that claim, is entitled to an evidentiary hearing in federal court." *Siripongs v. Calderon*, 35 F.3d 1308, 1310 (9th Cir.1994).

### B. STANDARD FOR A SUBSTANTIVE INCOMPETENCE CLAIM

Competence to stand trial requires that a defendant have "a rational as well as factual understanding of the proceedings against him" and "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." *Godinez v. Moran,* 509 U.S. 389, 396, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993) (internal quotation marks omitted). Factors relevant to a competency determination include evidence of irrational behavior; demeanor at trial; and prior medical opinions on competence. *Torres v. Prunty*, 223 F.3d 1103, 1108–09 (9th Cir.2000).

### C. STANDARD APPLIED TO DAVIS'S CLAIM

Davis has at least a "colorable" claim under the second prong of the competency test—the requirement that a defendant be able to communicate with and assist his attorneys. One of Davis's lawyers, William Maxwell, told the trial court on November 29, 1989[2] that Davis was "incom-

---

**1.** The limitations of 28 U.S.C. § 2254(e)(2) do not apply in this case. Davis was diligent in state court; he made requests for investigation funds, discovery and evidentiary hearings that were denied. *See Jaramillo v. Stewart*, 340 F.3d 877, 882 (9th Cir.2003) ("Absent a showing of a lack of due diligence, a petitioner will be excused from showing compliance with the balance of [§ 2254(e)(2)'s] require-

ments.") (internal quotation marks omitted); *see also Williams v. Taylor*, 529 U.S. 420, 442–43, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000) (finding it significant that request for investigation funds was denied in state court).

**2.** Davis's guilt phase ended on November 22, 1989. The sentencing phase began in early January 1990.

municado" and that if he continued in his then "mental state" an incompetency hearing could become necessary. Maxwell also reported to the court:

- "I think the Court needs to know that ... Mr. Davis is in a mental state ... where I don't think he is going to be any longer able to cooperate with his counsel in the conduct of his defense."
- "If he's getting that paranoid and he's flipping out that much from whatever is happening over there with him and he can't even talk to his attorneys ... we may have a real problem."
- "I think the problem is he's gonna fold up, he's not gonna talk, he's not gonna take part."
- "So we are right back to—we are back in a situation ... I guess I can tell the Court this,—the first several times I went to see Mr. Davis he would not talk to me about the case."

In a declaration he signed in 1997, Maxwell indicated that the situation with Davis did not improve significantly before the sentencing phase: "After the guilt phase ended, Mr. Davis stopped cooperating with me and Mr. Alvarado [Maxwell's co-coun-

sel]. During the period between the guilt phase and the penalty phase, Mr. Davis would not talk to us." Maxwell explained his failure to pursue a competency hearing with the lay opinion that Davis was possibly "just malingering," but Maxwell also recognized that a qualified psychiatrist "might have found that Mr. Davis's behavior at the penalty phase was not purely volitional." [3]

In fact, two psychiatric professionals have expressed the opinion that Davis's inability to communicate with counsel was not purely volitional. According to Dr. Vicary, Davis's inability to cooperate with counsel "had both a mental illness and a behavioral component" and some of Davis's actions "had to have been the product of mental illness." Davis "was severely depressed, agitated and anxious, so much so that he was exhibiting signs of paranoia." Dr. Vicary stated that Davis's "competency was a legitimate concern at the penalty phase" and that Davis was "marginal," in a "gray area between competency and incompetency." Dr. Vicary's opinion is significant and compelling because Dr. Vicary knew Davis at the relevant time.[4]

3. Maxwell's statements questioning Davis's competency support Davis's claim. As a lay person, Maxwell was not qualified (as he recognized) to decide whether Davis was actually unable or simply unwilling to communicate with counsel. *See Odle v. Woodford*, 238 F.3d 1084, 1088–89 (9th Cir.2001) (explaining that because a defense attorney "is not a trained mental health professional, ... his failure to raise petitioner's competence does not establish that petitioner was competent"). And, as is discussed below, Davis offers expert testimony that his symptoms might well have appeared as malingering to a lay person, although, in fact, his conduct was not volitional. What Maxwell *was* competent to observe and understand helps Davis's case— Davis stopped communicating meaningfully with counsel.

4. (The majority suggests that Dr. Vicary's declaration is not compelling because Vicary

signed it in 1997. But the case the opinion cites—*Douglas v. Woodford*, 316 F.3d 1079, 1090 (9th Cir.), *cert. denied*, —— U.S. ——, 124 S.Ct. 49, 157 L.Ed.2d 23 (2003))—involved psychiatrists who *did not know or examine the defendant at the time of trial*. Douglas submitted the declarations of two psychiatrists, one who examined Douglas seven years before Douglas's trial and one who examined Douglas for the first time thirteen years after the trial. 316 F.3d at 1094. In this case, by contrast, Dr. Vicary had extensive contact with Davis throughout the trial and sentencing phase.

As we recognized recently in *Deere v. Woodford*, 339 F.3d 1084 (9th Cir.2003), a declaration prepared for a habeas corpus petition by a doctor who knew the petitioner at the relevant time is compelling evidence—even if the declaration is prepared years after the trial. *Id.* at 1085, 1086–87 (considering as signifi-

The majority notes that Dr. Vicary "did not see fit to place himself within the company of those few psychiatrists" who would have found Davis incompetent. But because there cannot be a "gray area between competency and incompetency" in the context of the defendant's fitness to stand trial, Dr. Vicary's statements that Davis was "marginal" and in a "gray area" raise a substantial question about Davis's competence, which is all that is required to trigger the necessity for an evidentiary hearing. *See Boag*, 769 F.2d at 1343; *see also Siripongs*, 35 F.3d at 1310.

Dr. Vicary's opinion is echoed by Dr. Sara Latz, a psychiatrist who has reviewed records from the trial and psychological evaluations and testing done at the time of trial. In Dr. Latz's opinion, the materials she has reviewed "raise a serious question as to Mr. Davis's competency at the time of the penalty phase." Dr. Latz's opinions provide a response to Maxwell's concern that Davis may have been malingering. According to Dr. Latz: "[Davis's] depression was likely misinterpreted by others as anger and defiance. Consequently, petitioner was likely to be treated with punishment rather than anti-depressant medication. Punishment, however, would generally be ineffective with petitioner because his behavior was not entirely within his control."

Dr. Latz recognizes that she would need more information to make a "proper competency determination," but her conclusion that there is a "serious question" about competency provides support for the need for an evidentiary hearing. Retrospective competency evaluations are given less weight, but they are "permissible" where, as here, the psychiatrist has "consult[ed] contemporaneous medical reports." *Williams v. Woodford*, 306 F.3d 665, 707 (9th Cir.2002).

The deposition of Myra Thomas, a sentencing-phase consultant, provides additional support for Davis's claim. Thomas testified that Davis "totally changed" from when she first met him to the end of the trial. Davis believed he was physically paralyzed; "he couldn't move;" he was "out of it" and "paranoid;" he "lost it;" he became "very difficult to get through to," "hysterical," and "unfocusable towards the end." The majority discounts Thomas's testimony on the grounds that Thomas and Davis had a "poor rapport" and that "[Thomas's] testimony reflects that [Davis's] behavior probably resulted from his anger towards [Thomas], his attorneys, and the entire process," not from incompetency. But a poor rapport does not explain away Thomas's observation that Davis's behavior deteriorated significantly; there is no evidence that the relationship between Thomas and Davis worsened over time. The opinion's assumption about "anger" as the sole cause of Davis's condition is contradicted by Thomas's testimony. Thomas attributed Davis's condition to "depression ... intermingled with ... anger and paranoia."

Four other factors support the need for an evidentiary hearing in this case. First, Dr. Vicary testified during the sentencing phase that Davis had attempted suicide in the past and that he reported "see[ing] things, animals, people around [him] that

cant the declaration of a doctor who examined Deere at the time of trial in 1982 but who signed his declaration in 1993 for Deere's habeas petition). What matters is whether the declarant knew the petitioner at the time of trial, so that the declarant's conclusions (whenever put in declaration form) are based on observations from the relevant time period. *Id.* at 1086–87 ("Dr. Jones's declaration ... is based on his two examinations of Deere, which he performed in 1982, within several days of when Deere pleaded guilty. It is, therefore, probative of Deere's mental status at the critical time.").

others do not see." Davis's past suicide attempts and hallucinations suggest a history of mental illness—illness that easily could have resurfaced during the penalty phase. Second, Judge Letts issued an order stating that a court-appointed mental health expert would evaluate his competence:

> Petitioner's request to retain a psychiatrist to determine if he was competent to stand trial at the penalty phase is granted. While funds are being authorized to allow petitioner to uncover factual support for potential claims, any questions relating to petitioner's mental state raised in the federal habeas petition will be addressed by a court appointed mental health expert.

Judge Tevrizian read Judge Letts's order as stating only that Judge Letts would appoint an expert if Davis met the "substantial evidence" standard for an evidentiary hearing. I agree with Davis's counsel, however, that the language in Judge Letts's order must be read as stating that the court *would* appoint an expert. Because this is a death case, it is troubling that the majority would deny Davis's competency claim without an evidentiary hearing when the first trial court judge to consider the case indicated his intent to appoint a mental health expert. Third, there is evidence in the record that Davis may have been abused in prison during his trial. We have recognized that in-prison treatment may cause significant deterioration in a defendant's mental condition and may be relevant to a competency determination. *See Comer v. Stewart*, 215 F.3d 910, 916 (9th Cir.2000).

Finally, I note that our recent opinion in *Deere v. Woodford*, 339 F.3d 1084 (9th Cir.2003), provides support for the conclusion that an evidentiary hearing must be granted in a case such as this. The *Deere* panel remanded for an evidentiary hearing

on the petitioner's claim that he had been incompetent to plead guilty. The petitioner in *Deere* presented the following evidence: (1) a psychiatric report prepared at the time Deere pled guilty that found him competent; (2) a report prepared by a psychologist (Dr. Jones) at the time Deere pled guilty which found that Deere understood the proceedings and "evidenced no obvious thought disorders;" (3) a post-plea declaration submitted by Jones in which he stated that Deere's competency was "very questionable" because although Deere understood the nature of the proceedings, he was "bent on self-destruction" and was unable to "cooperate[ ] in a meaningful way" with defense counsel; and (4) a declaration submitted by a psychiatrist (Dr. Rosenthal) who did not know Deere at the relevant time but who opined that Deere was incompetent when he pled guilty. *Deere*, 339 F.3d at 1085–86.

Deere may have had something Davis does not—Dr. Rosenthal's opinion that Deere was incompetent when he pled guilty—but the *Deere* panel did not rely on Dr. Rosenthal's declaration because he did not know Deere at the relevant time. *See Deere*, 339 F.3d at 1086. Instead, the *Deere* panel emphasized Dr. Jones's opinion that Deere's competency was "questionable" and that Deere could not communicate meaningfully with defense counsel. *Id.* at 1086–87 ("Dr. Jones's declaration, however, stands on different footing[than Dr. Rosenthal's]. It is based on his two examinations of Deere, which he performed in 1982, within several days of when Deere pleaded guilty. It is, therefore, probative of Deere's mental status at the critical time."). Dr. Vicary's declaration in this case is very similar to Dr. Jones's, and, as in *Deere*, provides strong support for the petitioner's claim.

Davis also has some evidence that Deere did not: Maxwell's declaration that estab-

lishes communication problems; Thomas's testimony about Davis's deteriorating mental state; evidence that Davis had attempted suicide in the past; and evidence that Davis believed he was paralyzed when in fact he was not.

### D. SUMMARY OF DAVIS'S SUBSTANTIVE INCOMPETENCE CLAIM

Davis's evidence meets the relatively low threshold that mandates an evidentiary hearing. To all appearances Davis acted irrationally during the sentencing phase. *See Drope v. Missouri*, 420 U.S. 162, 180, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975) (a defendant's irrational behavior and demeanor at trial are factors to be considered in assessing competence); *Torres*, 223 F.3d at 1109 (stating that "defendant's unusual and self-defeating behavior in the courtroom suggested that an inquiry into competence was required"); *cf. Williams*, 306 F.3d at 703 (finding it significant that Williams did not "evidence any bizarre or irrational behavior"). He believed he was paralyzed when he wasn't; he insisted on self-destructive behavior, including his refusal to sit at counsel table; and he turned down medicine that might have helped him because, according to Dr. Vicary, he "was so impaired at that point that he did not understand that medication would help him." *Compare Torres*, 223 F.3d at 1109–10 (defendant "insisted on wearing jailhouse blues; threatened to assault his attorney; insisted, after being ordered shackled, to be handcuffed as well; and continually disrupted the trial"). It is also clear that Davis was not communicating well (if at all) with his attorneys; a defendant's competence turns on whether he has "the ability to communicate with counsel in helping prepare an effective defense." *Odle v. Woodford*, 238 F.3d 1084, 1089 (9th Cir.2001). Finally, the declarations signed by Drs. Vicary and Latz raise at least a "substantial doubt" as to Davis's competency. *Boag*, 769 F.2d at 1343.

### II. INEFFECTIVE ASSISTANCE OF COUNSEL

Davis contends that defense counsel was ineffective for failing to put on additional mitigating evidence, for failing to prepare adequately for Dr. Vicary's expert testimony, and for delivering an extremely hostile closing argument. I conclude that Davis is entitled to an evidentiary hearing on his mitigating evidence claim, and that his claims regarding Dr. Vicary and Maxwell's closing argument should also be developed at an evidentiary hearing so that they may be considered as part of a cumulative error analysis.

### A. STANDARD FOR AN INEFFECTIVE ASSISTANCE CLAIM

Davis must meet two requirements to establish ineffective assistance. First, he must show that counsel's performance was "deficient"—that it was not reasonable under "prevailing professional norms." *Strickland v. Washington*, 466 U.S. 668, 687, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Second, he must demonstrate prejudice to his defense. *Id.* at 687, 104 S.Ct. 2052. This requires showing "a reasonable probability that, but for counsel's unprofessional errors, the result ... would have been different." *Id.* at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* I conclude Davis has met that burden.

### B. ADDITIONAL MITIGATING EVIDENCE CLAIM

#### 1. WITNESSES NOT CALLED

Defense counsel or their sentencing consultants interviewed fifteen mitigation witnesses in addition to those witnesses actually called during the sentencing phase. Davis argues that defense counsel was in-

effective for failing to call some of the additional witnesses who had been interviewed, and he points to notes from interviews with those witnesses as evidence of what the witnesses would have testified to if called. The interview notes on which Davis relies indicate that three of the additional witnesses would have given positive, non-cumulative testimony.

First, Davis's sister, Sherri Davis, told an interviewer that Davis's mother "mentally and physically abused the kids" and that, in Sherri's opinion, "David got hit by his mom one too many times." No witness actually called by the defense testified that Davis had been physically abused as a child.[5] Instead, Davis's mother and sister, Terri Reynolds, testified that although other children in the family had been physically abused, Davis was spared. The state's attorney emphasized this issue in closing argument: "[Davis's mother is] described as cold and unloving and, according to Dr. Vicary, physically abusive to the defendant. Well, . . . he doesn't have any support for that. . . . [B]oth of the daughters who testified . . . never saw her physically abuse [Davis] but she did physically abuse at least one of the daughters."

Second, Davis's aunt Olivia Guerrero told an interviewer that when she visited Davis's family, she noticed that Davis and one of his sisters were singled out for negative treatment:

> During her visits to California, [Guerrero] saw differences in the way Sandra treated her kids. Her gut feeling was that [Davis] was treated differently (not favorably), because he was a boy. She also felt that Tracy was treated differently than the others, even though she was a girl. [Guerrero] points out that what's interesting is that

those two, [Davis] and Tracy, turned out to be the two problem children.

[Guerrero] says she wasn't around Sandra and her family enough to see what was really going on. But in the brief time she did spend in the home, there seemed to be differences. It seemed to her that if all the kids were disciplined for an identical misbehavior, [Davis] got more discipline, and more severe disciplin[e] than the others. The others were allowed to slide sometimes, [Davis] wasn't. [Davis] seemed to get the brunt of Sandra's anger. Also, to [Guerrero], [Davis] and his behavior, seemed the same as the other kids. In other words, she could never see a reason for Sandra to be harder on [Davis].

In contrast to Guerrero's account, Davis's sister Terri Reynolds testified during the sentencing phase that the boys were rarely disciplined. Guerrero's testimony would thus have been significant because it would have explained why Davis had more problems as an adult than his siblings did and would have undermined Terri Reynolds's account that Davis had been favored by his mother. The state's attorney emphasized Terri Reynolds's account during closing argument: "[B]oth of the daughters who testified . . . said that it really made them mad that [Davis's mother] favored the defendant and his brother, Chris . . . ."

Third, Davis's second wife, Leticia Hernandez, told an interviewer that Davis was a good father and husband and that he had never been violent toward her. Hernandez attributed Davis's occasional "strange look" or behavior to "something in his past." Hernandez also confirmed the defense's story that Davis and Hernandez had had a fight before the murder because Davis did not want Hernandez smoking while pregnant: "[Hernandez] says she

---

5. Dr. Vicary testified that he had learned of physical abuse while preparing his report, but the jury was instructed not to consider such evidence for its truth.

and David had a fight the night before the murder.... They fought because David wouldn't give her any money for cigarettes. She says she wasn't supposed to be smoking because she was pregnant, but she wanted her cigarettes anyway. She told David to get out of her house, or she would call the police."

Although other witnesses testified that they did not believe Davis was a violent person, only Hernandez could have countered the state's significant aggravating evidence that Davis had a recent tendency toward spousal abuse and, more generally, abuse of women. The state's attorney summarized this point in his closing argument: "He's gotten worse. Over the last five to ten years, his life shows an increasing pattern of misbehavior and violence towards both men and women but especially women." In fact, the state's attorney emphasized that the defense had failed to call Davis's second wife. He argued that Hernandez's absence undermined other witnesses' positive testimony about Davis.

> [W]e heard some witnesses about what the defendant was like at various times.
>
> And when did these witnesses know him? In almost all cases, these are witnesses out of the past.
>
> . . .
>
> So ... doesn't it sound to you like they're really digging in the bottom of the barrel to come up with something mitigating about his background?
>
> . . .
>
> Well, think about who they called. Mostly people out of the past.
>
> And then think about this: Who didn't they call?
>
> . . .
>
> They didn't call his second wife, Leticia Hernandez, although Dr. Vicary had

bad things to say about her like he did just about everybody else....

> Why not call her to find out what the defendant's been like since she's known him? She married him even after he was arrested for this, so she can't be totally disloyal.
>
> So they didn't call people who have known him most recently and primarily they called people who knew him back 8, 10, 12 years ago.

The state's attorney also challenged the truth of the defense's story about why Davis and Hernandez fought before the murder. In addition to countering that point, Hernandez's testimony that she attributed Davis's behavior to "something in his past" would also have provided support for the defense's argument that Davis's behavior was the result, at least in part, of a traumatic childhood or of mental illness.

### 2. DEFICIENT PERFORMANCE

"To perform effectively in the penalty phase of a capital case, counsel must conduct sufficient investigation and engage in sufficient preparation to be able to 'present[ ] and explain[ ] the significance of *all* the available [mitigating] evidence.'" *Mayfield v. Woodford*, 270 F.3d 915, 927 (9th Cir.2001) (en banc) (emphasis added) (quoting *Williams v. Taylor*, 529 U.S. 362, 399, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); alterations in *Mayfield*). The Supreme Court recently emphasized this point in *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). In *Wiggins*, the Court noted that the ABA Guidelines for capital defense work provide that effective assistance "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *Id.* at 2537 (emphasis in *Wiggins*); *see also Allen v. Woodford*, 366 F.3d 823, 845 (9th

Cir.2004) (quoting this text from *Wiggins* ).

In this case, Davis's defense attorneys failed in their duty to present all available, non-cumulative mitigating evidence. I find no suggestion in the record of a strategic reason to explain defense counsel's failure to call Sherri Davis, Olivia Guerrero and Leticia Hernandez; the interview notes do not refer to any significant negative testimony that would have outweighed the positive testimony the witnesses apparently would have given. Absent a sound strategic explanation, defense counsel's failure to call witnesses who would have provided significant mitigating testimony "fell below an objective standard of reasonableness." *Wiggins,* 123 S.Ct. at 2535 (quoting *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052).

### 3. PREJUDICE

The test for prejudice is whether there is "a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695, 104 S.Ct. 2052; *Mayfield,* 270 F.3d at 928–29 (applying this standard and reversing death sentence because en banc panel could not conclude "with confidence that the jury would unanimously have sentenced [the petitioner] to death if[defense counsel] had presented and explained all of the available mitigating evidence").

*Mayfield* provides support for a prejudice finding in this case. The aggravating evidence against Davis is no stronger than in *Mayfield.* Mayfield killed two people after threatening them with a gun for fifteen minutes; he then lay in wait, armed with a knife, for a third person. *Id.* at 920–21, 929. Mayfield had a criminal and violent past: he had pled guilty to auto theft; he had fired a gun into the home of one ex-girlfriend; and he had physically abused another former girlfriend. *Id.* at 920, 929. The en banc panel described the aggravating evidence against Mayfield as "strong." *Id.* at 929.

Mayfield's defense lawyer did put on some compelling mitigation evidence similar to that presented in Davis's case. *See id.* (describing the mitigating evidence presented by the defense as "substantial"). The defense put on evidence that Mayfield had suffered from depression as a child; that he was addicted to PCP; that he had had an increasingly tense relationship with his mother as he grew up; that he suffered from diabetes; that he had expressed remorse for his actions "in different ways at different times;" and that the violent crime was out of character. *Id.* at 929–30. The defense failed to put on additional evidence about Mayfield's traumatic childhood struggle with diabetes, his substance abuse, as well as character evidence about Mayfield's positive relationships with friends and with children. *Id.* at 930–32. The *Mayfield* panel held—notwithstanding the strong aggravating evidence and the compelling mitigating evidence the defense did present—that there was a "reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed." *Id.* at 932 (quoting *Strickland,* 466 U.S. at 700, 104 S.Ct. 2052).

Here, as in *Mayfield,* defense counsel failed to put on evidence of a traumatic childhood experience—here with physical abuse, as opposed to diabetes in *Mayfield.* The Ninth Circuit has recognized that evidence of a traumatic background is significant at the penalty phase:

> Evidence regarding social background and mental health is significant, as there is a "belief, long held by this society, that defendants who commit criminal

acts that are attributable to a disadvantaged background or to emotional and mental problems, may be less culpable than defendants who have no such excuse."

*Douglas v. Woodford,* 316 F.3d 1079, 1090 (9th Cir.) (quoting *Boyde v. California,* 494 U.S. 370, 382, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990)), *cert. denied,* 540 U.S. 810, 124 S.Ct. 49, 157 L.Ed.2d 23 (2003); *see also Hendricks v. Calderon,* 70 F.3d 1032, 1044 (9th Cir.1995) (holding that the failure to present evidence of physical and psychological abuse was prejudicial). Leticia Hernandez's testimony, like the testimony of friends and family in *Mayfield,* would have provided an important "humanizing" account of a positive recent relationship and of Davis's self-control. *Mayfield,* 270 F.3d at 932. Given the testimony of Davis's first wife and the state's closing argument, Hernandez's testimony also would have rebutted a key element of the state's case in aggravation.

### 4. THE MAJORITY'S ANALYSIS

The majority gives three reasons for rejecting Davis's claim that defense counsel was ineffective for failing to put on additional mitigation witnesses: (1) conclusory allegations; (2) cumulative or negative testimony; and (3) failure to exhaust.

Given the interview notes Davis submitted, I do not agree that he presented only "conclusory" allegations.[6] I also do not agree, for the reasons given above, that all of Davis's additional witnesses would have given only negative or cumulative testimony. Finally, Davis makes a compelling argument rebutting the failure-to-exhaust rationale. Judge Letts twice found Davis's claims exhausted, and Judge Tevrizian reversed those rulings without notice. In light of Judge Letts's rulings, Judge Tevri-

zian at least should have given Davis the opportunity either to dismiss and return to state court or to stay his federal petition pending another round of state habeas filings. Judge Tevrizian's order also overturned the law of the case. *See United States v. Alexander,* 106 F.3d 874 (9th Cir.1997) (reversing district court for improperly overruling decision made by district court judge to whom case had originally been assigned). The inconsistency between Judge Letts's and Judge Tevrizian's orders prejudiced Davis: Davis reasonably relied on Judge Letts's ruling as to which of his claims were unexhausted when he returned to state court to exhaust his unexhausted claims.

In any event, only the claim regarding Sherri Davis is affected by the exhaustion requirement. The district court did not question exhaustion of the Guerrero and Hernandez claims. Even if the majority persists in relying on a failure-to-exhaust rationale with respect to Sherri Davis's testimony, Davis should be granted an evidentiary hearing as to incompetence of counsel based on failure to call Guerrero and Hernandez.

### C. CUMULATIVE ERROR

Davis's second and third ineffective assistance claims may best be considered—together with his claim regarding additional mitigating witnesses—as part of a cumulative error analysis. *See Harris v. Wood,* 64 F.3d 1432, 1438 (9th Cir.1995) (considering combined prejudicial effect of trial counsel's errors). I address the two claims in turn under *Strickland's* first prong: first, the claim that defense counsel prepared inadequately for Dr. Vicary's testimony, and second, the claim that Maxwell delivered a rude and hostile closing

---

**6.** Right or wrong on this point, Judge Tevrizian in a death penalty case abused his discre-

tion in not granting leave to amend to add information from the interview summaries.

argument. I will then address the claims together under *Strickland's* second, prejudice, prong.

### 1. INADEQUATE PREPARATION FOR DR. VICARY'S TESTIMONY

Inadequate preparation for a witness's testimony may itself constitute deficient performance, even if the decision to call the witness could ultimately be considered reasonable. *See Alcala v. Woodford,* 334 F.3d 862, 890 (9th Cir.2003) ("We need not determine whether, after proper preparation, the decision to call Vogel might have been a reasonable exercise of professional judgment. In the absence of such preparation, ... trial counsel's performance was clearly deficient."); *see also Wiggins,* 123 S.Ct. at 2536 ("[O]ur principal concern ... is not whether counsel should have presented a mitigation case. Rather, we focus on whether the *investigation* supporting counsel's decision not to introduce mitigating evidence ... *was itself reasonable.*") (first emphasis added) (citing *Williams v. Taylor,* 529 U.S. at 415, 120 S.Ct. 1495 (O'Connor, J., concurring) (noting counsel's duty to conduct a "diligent" investigation into his client's background)).

In this case, Jorge Alvarado, the defense lawyer primarily responsible for Dr. Vicary's testimony, "never talked specifically [with Dr. Vicary] about what information he might mention during cross-examination"—despite the fact that Alvarado had been told, both by colleagues and by Dr. Vicary, himself, that Dr. Vicary "had a bad reputation for offering damaging testimony from the stand" and "would say things that most lawyers would be shocked about." Instead of asking Dr. Vicary what negative testimony he planned to offer about Davis, Alvarado apparently relied on Dr. Vicary's statements that "whatever he said would not be that bad" and that "he could ... explain away the cross-examina-tion during redirect examination." Alvarado was completely unprepared for Dr. Vicary's diagnosis of antisocial personality disorder. Obviously, Dr. Vicary's ability to "explain" cross-examination on re-direct was limited in this case because Alvarado never found out what negative testimony Dr. Vicary planned to offer or could develop and never asked Dr. Vicary the appropriate questions. Alvarado could not in advance prepare questions that would allow Dr. Vicary to "explain away" anything. Alvardo could not and did not prepare adequately for the rehabilitative re-direct that Dr. Vicary expected. In fact, according to Myra Thomas, Alvarado was "overwhelmed" by and did not know "what to do with" Dr. Vicary's testimony during the penalty phase.

The complete failure to investigate and prepare for Dr. Vicary's negative testimony was devastating and cannot possibly be considered "sound trial strategy." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052; *see also Alcala,* 334 F.3d at 890.

### 2. RUDE AND HOSTILE CLOSING ARGUMENT

As the majority recognizes, attorney Maxwell delivered a closing argument that at best could be described as "unusual" and at worst calculated to condemn his client. Here are a sample of his statements:

- "Good afternoon, ladies and gentlemen. We will start right out with a comment that I have a strong belief that some of you have already decided this phase of the case to yourselves and to those, probably ... nothing I can say is going to have any particular value."
- "[W]e [criminal lawyers] are kind of technicians .... And we're jaundiced and we are cynical. And we have talked about theory and we talk about

what people will 'buy' and we ... manipulate you and we do that because [that is our] stock [in] trade. That is what we are trained to do. ... That is how we as lawyers ... get our notches on our gun, so to speak...."

- "I truly believe that murder cases in general are the easiest kinds of cases upon which to get convictions. Now you have to notice I did not say the easiest to prove. I said the easiest to get convictions."

- "The only difference between what [you're] being asked to do and premeditated murder in the first degree is that we label it 'legal.' "

- "I would like to talk about [Davis] from ... a standpoint of someone who ... does not believe that the evidence in this case was sufficient to justify your verdict previously rendered but with an acceptance that that is the way it is."

- "Now you can poo-poo and shake your head and give me that 'BS' look if you wish, and that is fine...."

- "You're going to make your decision regardless of what any of us say here and I'd like you to consider a couple of points."

Because I cannot imagine a sound reason for what can best be described as Maxwell's "attack" approach, I conclude that his closing statement was not reasonable under "prevailing professional norms." *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. The majority agrees, rather relying on *Strickland's* second, prejudice, prong to defeat this claim.

### 3. PREJUDICE

Viewed cumulatively, counsel's errors— the failure to prepare for Dr. Vicary's testimony, Maxwell's closing argument, and the failure to put on additional mitigating witnesses—undermine confidence in the outcome of the sentencing phase. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

Dr. Vicary's testimony and Maxwell's closing argument were profoundly important to Davis's case in mitigation. Dr. Vicary did provide some mitigating evidence, but he also testified that he believed Davis was guilty and had lied; testified about the negative attributes of antisocial personalities; testified that his opinion about remorse was at least somewhat undermined by statements Davis made to jailhouse informants; testified that there were "no excuses" for Davis's own "bad choices"; testified that Davis kept his emotions bottled up inside until a triggering event; testified that anti-social personalities could never truly be cured; testified that the best predictor of future behavior is past behavior; and testified about what he believed to be several aggravating factors in the case.

Defense counsel's attempt at redirect was very brief and did not address at all the ASPD diagnosis. Redirect was also conducted by attorney Maxwell rather than by Alvarado, the defense lawyer responsible for Dr. Vicary's testimony. As Alvarado explained in his April 1997 declaration, he was "shocked" by Dr. Vicary's "harsh testimony" and "did not believe [it] could be explained away on redirect." Even Dr. Vicary signed a declaration in 1997 stating that he was "disappointed" in the weak re-direct. Dr. Vicary apparently counted on a successful redirect to take some of the "venom" out of his earlier testimony, and he noted that he was never given a chance "to explain antisocial personality disorder as a legitimate, debilitating mental disorder."

With respect to Maxwell's closing argument, the majority emphasizes that Maxwell's troubling comments were part of a fifty-page closing argument. While true, the majority's approach does not take into

account that Maxwell's troubling comments were spread throughout those pages. Attorney Alvarado referred to Maxwell's statements in disagreement. This not only highlighted the statements in the eyes of the jury, but highlighted the disarray of the defense.

## III. JUROR BIAS IN FAVOR OF THE DEATH PENALTY

There may have been jury bias favoring death. Without a hearing we cannot be sure. The questions submitted by R.C. Schwartz, the jury foreman, indicate that he: (1) wanted at least to ensure that Davis would serve a life term without the possibility of parole; (2) believed that Davis would be paroled if given a life sentence; and (3) believed that imposing the death penalty would in fact achieve life without parole. The jury foreman may not have been biased in favor of a death sentence because he actually wanted Davis to die, but he was biased in favor of a death sentence because he believed it was the only way to achieve life without parole.

Due process requires a "a jury capable and willing to decide the case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). "A court confronted with a colorable claim of juror bias must undertake an investigation of the relevant facts and circumstances."[7] *Dyer v. Calderon*, 151 F.3d 970, 974 (9th Cir.1998) (en banc); *see also Smith*, 455 U.S. at 215, 102 S.Ct.

940("[T]he remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias."). The trial court's investigation must "be reasonably calculated to resolve the doubts raised about the juror's impartiality." *Dyer*, 151 F.3d at 974–75. The trial court's "fact-finding process" must be "objective" and must "reasonably explore[ ] the issues presented." *Id.* at 975.

In this case, the trial court conducted *no* hearing or investigation. The trial court never questioned the jury foreman about whether he could put his beliefs out of his mind in order to be fair and impartial. Defense counsel had no opportunity to probe the jury foreman's bias or to question him about impermissible discussions with other jurors.

The trial court gave a "curative" instruction, but that instruction was of dubious value. The trial court instructed the jury that it should not consider "parole" and that it should assume the authorities would "properly carry out their responsibilities," but it also confirmed the foreman's belief by stating that a future modification of Davis's sentence was possible. In doing so, the trial court drew the jury members' attention to the very issue—possibility of parole—that it then instructed them not to consider.[8]

## IV. CONCLUSION

For the foregoing reasons, I dissent from the majority's decision to deny relief

7. In *Tracey v. Palmateer*, 341 F.3d 1037 (9th Cir.2003), the trial court questioned the juror who overheard a potentially troubling conversation between two other jurors. *See id.* at 1039–40. In this case, no hearing of any kind was conducted.

8. The majority relies on *Anderson v. Calderon*, 232 F.3d 1053, 1098–99 (9th Cir.2000), in rejecting Davis's claim. *Anderson* is distinguishable for two reasons. First, *Anderson* addressed the petitioner's claim only on a

premature-deliberation theory, not a bias theory. Second, the juror note at issue in *Anderson* was less troubling than Schwartz's note. The *Anderson* juror asked: "Does life without possibility of parole really mean that? Or can Anderson, under the sentence, at some future time be released?" *Id.* at 1098. It appears from the note in this case that Schwartz had already reached his own conclusion.

as to the sentencing phase, and hereby amend the opinion by withdrawing my concurrence in the sentencing phase.